UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>PEQUOT CAPITAL MANAGEMENT, INC.<br>and ARTHUR J. SAMBERG,<br><br>Defendants. | Civil Action No.<br><br>JURY TRIAL<br>REQUESTED |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

### SUMMARY

1. This matter concerns insider trading in the securities of Microsoft Corporation ("Microsoft") in April 2001 by Pequot Capital Management, Inc. ("Pequot"), a registered investment adviser; Arthur J. Samberg ("Samberg"), its chairman and chief executive officer; and David E. Zilkha ("Zilkha"), then a Microsoft employee who had accepted an employment offer from Pequot. On Friday, April 6, 2001, amidst rumors that Microsoft would miss its earnings estimates for the quarter that had ended on March 31 (the "Third Quarter"), Samberg emailed Zilkha seeking information about whether Microsoft would hit its estimates. That weekend, Zilkha contacted colleagues at Microsoft and learned that Microsoft would meet or beat those estimates. He promptly conveyed a recommendation to purchase based on this material, nonpublic information to Samberg, who, on April 9 and thereafter, traded in Microsoft

1

options on behalf of funds managed by Pequot with the expectation that Microsoft's stock price would rise.

2. On April 19, 2001, after the market had closed, Microsoft announced its Third Quarter earnings. Consistent with the information Zilkha had conveyed to Samberg, Microsoft beat its earnings estimates. Microsoft's stock closed at $69 per share on April 20, the first trading day after the announcement, a rise of 96 cents per share from the close the previous day and of $12.43 per share from the morning of April 9. As a result of illegal trading by Samberg and Pequot, the Pequot funds received gains of $14,769,960, approximately $4.1 million of which were attributable to stakes held by Pequot and Samberg in the funds and to certain performance and management fees they generated.

3. By virtue of their respective conduct, Pequot and Samberg engaged in fraud in connection with the purchase or sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Accordingly, the Commission seeks the following relief as to each Defendant: (i) the entry of a permanent injunction prohibiting that Defendant from engaging in future violations of the federal securities laws; (ii) disgorgement of ill-gotten gains, including on a joint and several basis, the ill-gotten gains resulting from the illegal trading in Microsoft securities, plus prejudgment interest; and (iii) the imposition of a civil monetary penalty.

## **JURISDICTION**

4. The Commission brings this action pursuant to the enforcement authority conferred upon it by Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1]. This Court has jurisdiction over this action pursuant to Sections 21(e), 21A and 27 of the

Exchange Act [15 U.S.C. §§ 78u(e), 78u-1 and 78aa]. Additionally, many of the acts and practices alleged herein occurred within the District of Connecticut, which is also where Defendant Pequot is headquartered.

5. In connection with the conduct described in this Complaint, Defendants Pequot and Samberg directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, of the facilities of a national securities exchange, and/or of the means and instruments of transportation or communication in interstate commerce.

6. Defendants Pequot and Samberg, unless enjoined, will continue to engage in the acts, practices, transactions and courses of business alleged herein, or in acts, practices, and courses of business of similar object and purpose.

## DEFENDANTS

7. *Pequot Capital Management, Inc.* is an investment adviser incorporated in Connecticut. It was headquartered in Westport, Connecticut until May 2009, at which time its offices were moved to Wilton, Connecticut. Pequot has been registered with the Commission since 1998 as an investment adviser.

8. *Arthur J. Samberg*, age 69, a resident of Ossining, New York, has been Chairman and CEO of Pequot since its founding in 1998.

## RELEVANT INDIVIDUAL AND ENTITY

9. *David E. Zilkha*, age 41, currently a resident of Southbury, Connecticut, was a Microsoft employee from approximately July 20, 1998 until May 7, 2001. From approximately August 15, 2000 until his departure from Microsoft, he was a product manager within its MSN division. Zilkha was employed by Pequot from April 23, 2001 until November 16, 2001.

10. *Microsoft Corporation* is a public company incorporated and headquartered in Redmond, Washington. Its securities trade on the NASDAQ and are registered under Section 12(g) of the Exchange Act [15 U.S.C. §78l(g)]. It has traded at all pertinent times under the ticker symbol, "MSFT."

## FACTS

### Samberg Hires Zilkha

11. In January 2001, Zilkha, a product manager at Microsoft, was seeking to enter the investment management field for the first time.

12. On January 18, he interviewed with Samberg in the hopes of getting a position with Pequot as an analyst.

13. On February 28, Samberg extended Zilkha an offer to work as a Vice President at Pequot, reporting directly to Samberg.

14. That night, Samberg emailed Zilkha confirming that he had sent out the offer letter. In the email, Samberg expressed the view that the technology market had declined too far and that the Pequot funds he was managing should purchase securities of Microsoft and another high tech company based on the new products they were introducing.

15. Samberg stated that while Pequot's analysts did a good job covering the other high-tech stock,

> i'm not as impressed with our research on msft. do you have any current views that could be helpful? Might as well pick your brain before you go on the payroll!!

16. Zilkha replied the next day. Agreeing with Samberg, he said that he sensed that "the worst is over for Microsoft."

4

17. On or about March 4, Zilkha accepted Samberg's offer to work at Pequot and they determined that he would commence his employment on or about April 23, 2001.

18. On or about March 15, Samberg met with Zilkha at Pequot. On March 16, Samberg bought Microsoft call options and sold a corresponding number of put options at the same strike price. A call option gives the buyer an option to purchase from the seller 100 shares of stock at a strike price at any time up until expiration. A put option gives the buyer an option to assign to the seller 100 shares of stock at a strike price at any time up until expiration. By buying call options and selling a corresponding number of put options, an investor is able to reap essentially the same profit or loss as a stock owner would, but with a much smaller investment. This combination of option trades is known as a "long synthetic stock position."

19. Microsoft's earnings were set to be announced on April 19. In March and early April 2001, the belief of a number of analysts at Pequot and elsewhere was that Microsoft would fall short of Microsoft's previously announced earnings estimates for the Third Quarter.

20. On March 21, 2001, after receiving emails from a colleague that expressed dim views of Microsoft's earnings prospects, Samberg sold his long position.

21. On April 2, 2001, Samberg received research that included the view of the Chief Technology Officer of a major investment bank lauding Microsoft's new Windows 2000 product.

22. On April 3 and April 5, Samberg took another long synthetic position in Microsoft options on behalf of the Pequot funds he managed.

### Zilkha Provides Samberg with Inside Information and Samberg Trades on It

23.     On Friday, April 6, 2001, while Zilkha was still employed by Microsoft, Samberg contacted Zilkha at his Microsoft email address. Samberg wrote:

> I own some msft based on the win2000 cycle, despite recurring indications from knowledgeable people that the company will either *preannounce* or *take guidance down*. Any *tidbits* you might care to lob in would be appreciated

(emphasis added) (the "Tidbits Email").

24.     On Saturday, April 7, Zilkha responded to the Tidbits Email, telling Samberg he would get back to him "on MSFT ASAP."

25.     That night, using his Microsoft email address, Zilkha emailed two Microsoft colleagues explicitly asking for information about Microsoft's earnings results for the Third Quarter.

26.     In an email to one of the colleagues, Zilkha asked, "Any ideas on how the quarter has shaped up for MSFT?"

27.     Zilkha sent a separate email to his neighbor and colleague Mark Spain ("Spain"), a regional technology specialist in Microsoft's U.S. Sales and Services division. In the subject heading of the email, Zilkha asked, "Any visibility on the recent quarter?" In the body of the email, Zilkha further asked Spain directly, "Have you heard *whether we will miss estimates*? Any other info?" (emphasis added).

28.     On April 8, Spain responded to Zilkha in an email, noting that Microsoft was "on track" to meet its earnings estimates:

> march was the best march of record. made up the shortfall in us sub. w2k pro major contributor. on track for revised forecast (MYR).

6

29. On April 8 or April 9, 2001, Zilkha then communicated to Samberg Zilkha's understanding, based on the email Zilkha had received from Spain, that Microsoft would meet or beat its earnings estimates for the Third Quarter, information that had not yet been disclosed to the public. Zilkha conveyed this information with the intent of both benefiting Pequot and enhancing his stature with his new employer.

30. During the period from April 9 through April 11, 2001, Samberg purchased an additional 28,200 call options and sold a corresponding number of put options at the same strike price for the Pequot funds that he managed.

31. On April 16, another portfolio manager at Pequot "sold short" 800,000 Microsoft shares in trades totaling almost $50 million. A "short sale" is the sale of securities which the seller does not own or one consummated by the delivery of a security borrowed by, or for the account of, the seller. A seller makes a short sale in anticipation of a decline in the stock price.

32. The trades made by the other portfolio manager took place in Pequot funds that were not managed by Samberg, but Samberg was aware of the orders. Samberg then sought further comfort from Zilkha on the substantial position he had amassed in the company in anticipation of an increase in stock price. Minutes after the other portfolio manager placed the order to short Microsoft, Samberg emailed Zilkha, who was in Washington state, asking Zilkha for any "further [c]olor" on Zilkha's "alma mater" (*i.e.*, Microsoft).

33. Zilkha did not get back to Samberg until the evening of April 17, by which time Samberg had already (earlier that day) reduced his long Microsoft position. Even reduced, Samberg's long Microsoft remained substantial, comprising 21,000 call options.

34. Zilkha, who had gone to Microsoft's offices on April 17, responded to Samberg that evening with an email stating that he had "heard that afternoon from the MSN finance controller that our CFO has been much more relaxed before this next earnings release than he has been in the last year. Augurs well."

35. On April 19, before the Microsoft earnings announcement, and by then having received Zilkha's reply, Samberg increased his long position in Microsoft, buying 6,000 more call options and selling 6,000 put options on behalf of the Pequot funds. In addition, at Samberg's recommendation, a friend of Samberg's purchased 300,000 shares of Microsoft stock.

36. As a result of Samberg's trading activity, just prior to the Microsoft earnings announcement, the Pequot funds managed by Samberg owned 21,000 Microsoft call options that had been purchased after Zilkha had first conveyed to Samberg material, nonpublic information. Each of the call option purchases reflected Samberg's expectation that Microsoft's stock price would increase.

**Microsoft Announces Earnings and Samberg Credits Zilkha with Pequot Profits**

37. On April 19, 2001, once the market had closed at 4:30 p.m. Eastern Standard Time, Microsoft announced its earnings results, which were better than its previously announced estimates. In particular, Microsoft announced revenue of $6.46 billion and diluted earnings per share of $.44, beating its estimates of $6.3-$6.4 billion in revenue and $.42-$.43 in diluted earnings per share.

38. By the end of the next trading day, Microsoft's stock price per share jumped 96 cents from $68.04 at the close on April 19 to $69 at the close on April 20.

39. The Microsoft securities that Samberg had purchased on behalf of Pequot funds on or after April 9 and held as of April 20 increased in value by approximately $14,769,960. The gains by Pequot and Samberg flowing from their interests in the funds amounted to approximately $4.1 million. The balance of the gains went to the benefit of the Pequot funds and their investors. In addition, the friend of Samberg's who had purchased Microsoft shares at Samberg's recommendation on April 19 had gains of $372,060.

40. In the days following the Microsoft earnings announcement, Samberg credited Zilkha with his Microsoft trading and began recommending him to other colleagues at Pequot.

41. In an email sent the morning of April 20, for example, Samberg wrote to a Pequot analyst telling him, "david zilkha joins me Monday from Microsoft. You might want to talk to him about what he thinks is going on at the company."

42. Samberg then forwarded the email to Zilkha, with a note in which he attributed his successful Microsoft trading to Zilkha:

> our tech group has a very dim view of pc demand, and consequently msft. in fact, they are short the stock in one account, while it is my largest long. *(I shouldn't say this, but you have probably paid for yourself already!)* [emphasis added.]

43. In another email, dated April 23, Samberg told two of his colleagues, "our new guy, david zilkha, is in ct today. Check him out. He's already got a great p&l based on his msft ;input."

44. Zilkha reported to work at Pequot on April 23, 2001, but technically remained an employee of Microsoft until May 7.

45. On April 24, Zilkha emailed Samberg with a list of companies he proposed to cover for Pequot. In the email, he also expressed a concern about overlapping with other Pequot

9

analysts. Samberg responded with an email stating, in part, "do not worry over every little thing – just get to know the companies you listed, and tell me what to do with my msft position, which has been so successful already thanks to your help."

46. Zilkha also later received a complimentary email from a managing director at Pequot, who stated, "I am sitting here with 'the great one' aka art [Samberg]; who says we've made more money in msft in the last month than in the entire seven years before that!"

47. On or about September 25, 2001, Samberg told Zilkha that Zilkha's employment at Pequot was going to be terminated, but that he could continue to work at Pequot for a short period as he looked for a new job.

48. Zilkha's employment at Pequot was terminated on or about November 16, 2001.

### Zilkha's Fiduciary Duty to Keep Confidential All Material, Nonpublic Information about Microsoft

49. Zilkha knew that as a Microsoft employee, he had a duty to keep confidential all material, nonpublic information about Microsoft and that it was illegal to convey such information to Samberg.

50. Microsoft's insider trading policy, in effect during the relevant period and to which Zilkha was subject, made it clear that Zilkha could be held liable for tipping others to trade on inside information:

> Just as you may not trade in the stock of Microsoft when you know material nonpublic information, you may not disclose such information to any third party who then trades in Microsoft stock. This is considered illegal "tipping" and you could be held liable even if you yourself did not trade any Microsoft shares. You could also be held liable if you are found to have recommended to another that he or she buy or sell Microsoft stock, even if you do not disclose the material nonpublic information.

51. The Microsoft insider trading policy listed "fiscal quarter . . . financial results" among examples of material information and stated that "there is a considerable risk you will pay dearly if you engage in insider trading in Microsoft stock," listing some of the possible civil and criminal sanctions to which violators are subject.

52. Zilkha had also signed an employee agreement that expressly prohibited him from disclosing confidential information about Microsoft to persons outside of the company.

53. Samberg knew or was reckless in not knowing that when Zilkha provided him information about Microsoft's Third Quarter earnings, Zilkha was doing so in breach of Zilkha's duty to Microsoft to keep such information confidential.

54. Pequot's compliance manual in effect in April 2001 expressly prohibited "trading . . . on the basis of material, nonpublic information when the information either was disclosed in violation of an insider's duty to keep it confidential or was misappropriated." The manual made clear that such conduct was illegal and subjected a violator to a variety of possible civil and criminal remedies.

55. Samberg had signed a statement acknowledging Pequot's insider trading policy and he was therefore aware of the policy at the time he solicited information from Zilkha.

## CLAIM

## Unlawful Insider Trading
### (Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder)

56.     The SEC repeats and realleges paragraphs 1 through 55 above.

57.     By reason of the foregoing, Pequot and Samberg each directly or indirectly, by use of means or instrumentalities of interstate commerce or of the mails, or any facility of any national securities exchange, in connection with the purchase or sale of securities: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any persons, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

58.     Accordingly, the SEC respectfully requests that this Court issue a Final Judgment of Permanent Injunction and Other Relief:

A.      Permanently restraining and enjoining each Defendant, their agents, servants, employees, attorneys, successors and assigns, and those persons in active concert or participation with them, and each of them, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

B.      Ordering each Defendant to disgorge the ill-gotten gains from their illegal conduct, including, on a joint and several basis, the ill-gotten gains resulting from the illegal trading of Microsoft securities, plus prejudgment interest;

    C.    Ordering each Defendant to pay civil penalties, pursuant to the Insider Trading Sanctions Act of 1984, codified at Section 21A of the Exchange Act, as amended [15 U.S.C. § 78u-1];

    D.    Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

    E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The SEC hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION,**

By its attorneys,

_/s/ Luke Cadigan_
Luke T. Cadigan (Fed. Bar No. phv0552)
  Assistant Regional Director
James S. Goldman (Mass. Bar No. 648488)
  Senior Enforcement Counsel
33 Arch Street, 23rd Floor
Boston, Massachusetts 02110
(617) 573-8919 (tel)
(617) 573-4950 (fax)

Local Counsel:

_/s/ John B. Hughes_
John B. Hughes (Fed. Bar No. CT-05289)
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3802 (tel)
(203) 773-5373 (fax)

Dated: May 27, 2010